# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

LYNN HARASIN JOHNSON and
DON JOHNSON,

                              Plaintiffs,

        v.                                          1:04-cv-1320-WSD

GEORGIA TELEVISION
COMPANY d/b/a WSB-TV and
JENNIFER RIGBY,

                              Defendants.

---

## ORDER

This is an employment discrimination case in which Plaintiff Lynn Harasin
Johnson ("Harasin") and Plaintiff Don Johnson ("Johnson"), her husband, allege
that Harasin was reassigned from the morning news shift in retaliation for her use of
medical leave protected by the Family and Medical Leave Act, 29 U.S.C.
§§ 2601 et seq. ("FMLA").  It is before the Court on Defendants Georgia
Television Company d/b/a WSB-TV's ("WSB-TV") and Jennifer Rigby's
("Rigby") Motion for Summary Judgment [54].

## I.     BACKGROUND[1]

Harasin has been employed as a full-time reporter with WSB-TV since 1978. Reporters with WSB-TV generally are assigned to one of three news shifts: morning, day or evening.  Reporters assigned to the morning news shift generally work on the 5:00 a.m., 6:00 a.m. and 12:00 p.m. newscasts, and begin work at 3:00 a.m.  Reporters assigned to the day news shift generally work on the 12:00 p.m., 5:00 p.m. and 6:00 p.m. newscasts, and begin work at 9:00 a.m.  Reporters assigned to the evening news shift generally work on the 5:00 p.m., 6:00 p.m. and 11:00 p.m. newscasts, and begin work at 2:30 p.m.  From 1987 until May 2002, Harasin was assigned to the day news shift, appearing primarily on the 5:00 p.m. and 6:00 p.m. newscasts.  She reports directly to Mike Dreaden ("Dreaden"), the

---

[1]  Unless otherwise indicated, the Court draws the undisputed facts from Defendants' Statement of Undisputed Material Facts [54] filed in support of their motion for summary judgment and Plaintiffs' Statement of Material Facts As To Which They Contend There Exist Genuine Issues To Be Tried [59].  See L.R. 56.1, N.D. Ga.  Where Defendants have supported a statement of material fact with a citation to record evidence, the Court has deemed this fact admitted unless Plaintiffs in their response [59] dispute the fact as prescribed in Local Rule 56.1B(2)(a)(2).  Likewise, where Plaintiffs cite record evidence to support their statement of additional facts which they contend are material and present a genuine issue for trial, the Court has deemed the fact admitted unless Defendants in their response [80] have objected to the statement as provided for in Local Rule 56.1B(3).

Managing Editor for WSB-TV, who in turn reports directly to Rigby, the News Director.  Johnson, Harasin's husband, is employed as Chief Photographer with WSB-TV.

Harasin was diagnosed with fibromyalgia in 1997 by Dr. Randy Martin, the medical reporter at WSB-TV.  This diagnosis was confirmed in 1999 by Dr. Hayes Wilson, Harasin's treating physician.  Harasin testified that she does not remember exactly when she notified anyone at WSB-TV about her condition, but that she believes she told Dreaden and then News Director Ray Carter ("Carter") in 1999 or 2000.  Dreaden and Carter allowed Harasin to take intermittent leave for symptoms caused by her fibromyalgia.  Rigby replaced Carter as the News Director in January 2002.  During the early part of 2002, Harasin continued to take intermittent leave in connection with her illness.

On May 2, 2002, Rigby held a meeting with Dreaden and Harasin.  During this meeting, Rigby asked Harasin about her intermittent absences during 2002, and Harasin informed Rigby that the absences were caused by her fibromyalgia.  Rigby testified that this is the first time she had ever heard of fibromyalgia or that Harasin had been diagnosed with this condition.  Harasin testified that Rigby was skeptical of her explanation, and that she told Harasin that she needed to bring in a doctor's

note for every subsequent absence.  When Harasin stated that she did not believe a doctor's note was required under WSB-TV's work rules, Rigby "pounded her desk and said: 'These aren't WSB's rules, these rules are only for you.'"  (Harasin Dep. at 147.)[2]  Rigby also stated that Harasin would be required to supplement her personnel file with a letter from her treating physician explaining her condition. Harasin pointed out that her employment file already contained such a letter, and she offered Rigby a brochure on fibromyalgia to provide more general information concerning her condition.  Rigby became aggravated and refused the offer.

In April or May 2002, Rigby held discussions with certain WSB-TV management personnel, including Dreaden, regarding staffing issues.  As a result of these discussions, Rigby decided to reassign Harasin to the morning news shift.  It is unclear from the record whether this decision was made before or after Rigby's May 2, 2002 discussion with Harasin.  Defendants allege the reassignment decision was made in April 2002.  Rigby testified, however, that she was unsure of when the decision was made and that it could have been made in April or May 2002.  It is

_____

[2]  Rigby testified that she did not pound the table or raise her voice during the meeting, and she stated that WSB-TV "routinely ask[s] for doctor's notes for people who are out for multiple days or extended periods of time." (Rigby Dep. at 76).

undisputed that Rigby informed Harasin of the decision on May 17, 2002, and

Harasin was moved to the morning news shift effective June 10, 2002.   **II.   DISC**

**USSI**

**ON**

Harasin asserts claims against Defendants for unlawful retaliation under the

FMLA, and for intentional infliction of emotional distress, negligent infliction of

emotional distress and negligent retention.  Johnson asserts a loss of consortium

claim against Defendants.  Defendants move for summary judgment on all of

Plaintiffs' claims.[3]

---

[3] Plaintiffs did not respond to Defendants' arguments in favor of summary judgment on Harasin's claims for negligent infliction of emotional distress and negligent retention, as well as her FMLA retaliation claims based on conduct other than her reassignment to the morning news shift (*i.e.*, being required to provide doctor's notes for her absences, being placed on involuntary leave for spreading gossip concerning Rigby's personal life, etc.).  Accordingly, Plaintiffs have abandoned these claims and summary judgment on them is GRANTED.  See Bute v. Schuller Int'l, Inc., 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) ("Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned."); Welch v. Delta Air Lines, Inc., 978 F. Supp. 1133, 1137 (N.D. Ga. 1997) ("Plaintiff's failure to respond to Defendant's argument alone entitles Defendant to summary judgment on these claims.").

A.     <u>Summary Judgment Standard</u>

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  <u>Herzog v. Castle Rock Entm't</u>, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  <u>Graham v. State Farm Mut. Ins. Co.</u>, 193 F.3d 1274, 1282 (11th Cir. 1999).  The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  <u>Id.</u>

The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor.  <u>United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.</u>, 894 F.2d 1555, 1558 (11th Cir. 1990).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  <u>Graham,</u>

193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246. But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).


     **B.**    <u>Harasin's FMLA Retaliation Claim</u>

     The FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter . . . ."  29 U.S.C. § 2615(a)(2).  To succeed on an FMLA retaliation claim, "an employee must demonstrate that his employer intentionally discriminated against [her] in the form of an adverse employment action for having exercised an FMLA right."  <u>Strickland v. Water Works & Sewer Bd. of Birmingham</u>, 239 F.3d 1199, 1207 (11th Cir. 2001) (citations and punctuation omitted); <u>see also</u> <u>Johnson v. Morehouse College, Inc.</u>, 199 F. Supp. 2d 1345, 1359 (N.D. Ga. 2002) ("Unlike an interference claim, a plaintiff who asserts a retaliation claim must prove that the employer acted with the requisite intent to retaliate.").  Here, Harasin alleges she exercised her rights under the FMLA by

taking intermittent medical leave for her fibromyalgia in early 2002, and that

Defendants retaliated against her for exercising her rights by "demoting" her from

the day news shift to the morning news shift.  (Pls.' Resp. in Opp'n to Defs.' Mot.

for Summ. J. at 9-14.)

      Retaliation claims under the FMLA are analyzed using the familiar McDonnell

Douglas framework.  Strickland, 239 F.3d at 1207 ("When a plaintiff asserts a

claim of retaliation claim under the FMLA, in the absence of direct evidence of the

employer's intent, we apply the same burden-shifting framework established by the

Supreme Court in McDonnell Douglas Corp. v. Green . . . for evaluating Title VII

discrimination claims."); Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274,

1275, 1283 (11th Cir. 1999) (affirming district court decision applying McDonnell

Douglas framework to FMLA retaliation claim).  Under this framework, the plaintiff

must establish a prima facie case of retaliation with respect to the adverse

employment action in question.  See Smith v. BellSouth Telecomms., Inc., 273

F.3d 1303, 1314 (11th Cir. 2001).  If the plaintiff makes this prima facie showing,

the defendant must articulate a legitimate, nonretaliatory reason for the adverse

employment action.  Id.  If the defendant satisfies this requirement, the burden then

shifts to the plaintiff to show the defendant's legitimate, nonretaliatory reason is a pretext for unlawful retaliation.  Id.

        1.    *Prima Facie Case*

To establish a prima facie case of retaliation under the FMLA, Harasin must show that: (1) she availed herself of a protected right; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action.  Brungart, 231 F.3d at 798; Johnson, 199 F. Supp. 2d at 1359.  Defendants argue Harasin cannot demonstrate a prima facie case of retaliation because (i) her reassignment to the morning news shift did not constitute an adverse employment action, and (ii) even if it did, she cannot show a causal connection between her protected activity and her reassignment.[4] (Defs.' Br. in Supp. of Mot. for Summ. J. at 5-15.)

"[N]ot everything that makes an employee unhappy is an actionable adverse employment action."  Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1118 (11th Cir. 2001) (quoting Smart v. Ball State Univ., 89 F.3d 437 (7th Cir. 1996)).  "To be

---

[4] Defendants concede for the purposes of summary judgment that Harasin's intermittent leave in early 2002 constituted protected activity under the FMLA. (Defs.' Br. in Supp. of Mot. for Summ. J. at 5-6.)

considered an adverse employment action . . ., the action must either be an ultimate employment decision or else must meet some threshold level of substantiality." Stavropoulos v. Firestone, 361 F.3d 610, 616-617 (11th Cir. 2004) (examining whether employer's alleged conduct qualified as an adverse employment action in Title VII retaliation case).  "Ultimate employment decisions include decisions such as termination, failure to hire, or demotion."  Id.  To meet the "threshold level of substantiality" requirement, the employer's conduct must alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affects his or her status as an employee. Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000).  In this case, Harasin does not allege that she was subjected to an ultimate employment decision such as a discharge.  She argues her reassignment from the day news shift to the morning news shift constituted an adverse employment action because (1) the morning news shift was less prestigious than the day news shift; and (2) working on the morning news shift was harmful to her health.  (Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. at 9-14.)[5]

_____

[5]  Harasin also argues that WSB-TV's subsequent refusal to move her back to the day news shift constitutes an adverse employment action.  This argument is

Transfers or reassignments to a different position constitute adverse

employment actions if they involve a reduction in pay, prestige or responsibility.

See Hinson v. Clinch County, Ga. Bd. of Educ., 231 F.3d 821, 829 (11th Cir.

2000) (citing Doe v. Dekalb County Sch. Dist., 145 F.3d 1441, 1448 (11th Cir.

1998)).  To determine whether a transfer or reassignment constitutes an adverse

employment action, the Court uses an objective test, "asking whether 'a reasonable

person in [the plaintiff's] position would view the employment action in question as

adverse.'"  Hinson, 231 F.3d at 829 (citing Doe, 145 F.3d at 1449).  Because

claims challenging an employer's decision to transfer or reassign an employee

"strike at the very heart of an employer's business judgment and expertise[,] . . .

courts . . . have been reluctant to hold that changes in job duties amount to adverse

employment action when unaccompanied by any tangible harm."  Davis v. Town of

Lake Park, Fla., 245 F.3d 1232, 1244-45 (11th Cir. 2001) ("In the vast majority of

instances, however, we think an employee alleging a loss of prestige on account of

a change in work assignments, without any tangible harm, will be outside the

―――――――――――――――

without merit, since "[f]ailure to remedy a prior act of discrimination does not
constitute a new act of discrimination . . . ."  Everett v. Cobb County Sch. Dist.,
138 F.3d 1407, 1410 (11th Cir. 1998) (citing Lever v. Northwestern Univ., 979 F.2d
552, 556 (7th Cir. 1992)).

protection afforded by Congress in Title VII's anti-discrimination clause . . . .").
But see Doe, 145 F.3d at 1452 n.19 ("[W]e believe that loss of prestige, either
within an organization or with regard to the general public, is an objective factor that
a court should consider as part of the reasonable person test.  Beyond the loss of
prestige itself (a reasonable if egoistic employee goal much like salary or
promotion), diminishment of prestige may also affect an employee's marketability,
another significant objective factor.").

Admittedly, this is a difficult case.  First, because it involves the broadcast
news industry, and second, because it presents a close question.  It is undisputed
Harasin's reassignment to the morning news shift did not result in a decrease in pay
or benefits.  But changes in shift assignments in the broadcast news industry,
especially a change in assignment for on-air talent, are different from reassignments
within other businesses.  Elsewhere, a change in shift assignment in may be
undesireable, and may result in inconvenience for the employee, but typically does
not involve a material change in the employee's terms and conditions of
employment.  However, common sense dictates, and the testimony from those
familiar with the broadcast news industry confirms, that this industry is different,
and that reassignment from one news shift to another may involve a significant loss

of prestige.  In this case, various WSB-TV personnel characterized Harasin's

reassignment from the day news shift to the morning news shift as a "demotion."

The persons knowledgeable about this industry testified that full-time reporters at

the station generally worked the morning news shift when they first began their

careers, but that eventually the senior reporters moved to the day news shift and

worked on the much more prestigious 5:00 p.m. and 6:00 p.m. news broadcasts.

(Daniels Dep. at 18; Cardwell Dep. at 18-20.)  Dorothy Daniels, a WSB-TV

producer, testified that Harasin's reassignment to the morning news shift was a step

back in her career and resulted in less prestige and less exposure as a general

assignment reporter:

> [I]n [Harasin's] case, she was one of our general
> assignment reporters who was often the lead story or in
> the first block of the [5:00 p.m. and 6:00 p.m.]
> newscast[s].  She was what we called a heavy hitter. . . .
> So when you're first block of a newscast, that means
> you're on a major story.  You get major coverage.  To be
> removed from the position to [the morning news shift],
> it's seen as a demotion.

(Daniels Dep. at 17.)  Dale Cardwell, a general assignment reporter for WSB-TV,

testified that if a senior reporter was reassigned from the day news shift to the

morning news shift on anything more than a temporary basis, it should require

"significant compensation, discussions, [and] negotiations."  (Cardwell Dep.

at 19.)  Cardwell further testified that this move would adversely impact the

reporter's career and prospects for advancement outside the Atlanta market

because of the limited stories available to report on the morning news shift.

(Cardwell Dep. at 19-20.)  Ross Cavitt, a full-time reporter with WSB-TV, testified

that he viewed such a reassignment as a demotion, and that if it occurred to him, he

would believe that management was sending him a message to quit.  (Cavitt Dep. at

15-16.)  This testimony about the impact of Harasin's reassignment makes sense,

even to a consumer of the news.

        The Court finds, for the purposes of summary judgment only, that a

reasonable jury reviewing this evidence could conclude that Harasin's reassignment

to the morning news shift, although not accompanied by a loss of pay or benefits,

was effectively a demotion and included a loss of prestige and opportunity for

career advancement.  In other words, a reasonable person in Harasin's position --

that of a senior full-time, on-air reporter who had been working on the day news

shift since 1987 -- would view the reassignment to the morning news shift as

adverse.  See Hinson, 231 F.3d at 829.  Accordingly, Harasin's reassignment

constitutes an adverse employment action for purposes of her FMLA retaliation claim.[6][7]

To establish a prima facie case of FMLA retaliation, Harasin must also show that there was a causal connection between her FMLA leave and Rigby's decision to reassign her to the morning news shift. See Brungart, 231 F.3d at 798. "To establish the causal connection element, a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated." Id. at 799 (internal citations and quotations omitted). "The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact

---

[6] Defendants argue the reassignment did not result in a loss of prestige because Harasin received praise from the public and her colleagues for her performance as a reporter for the morning news shift. (Defs.' Br. in Supp. of Mot. for Summ. J. at 8.) That Harasin's performance as reporter for the morning news shift received praise from viewers and colleagues does not refute her evidence that reassignment to the position was adverse.

[7] Because the Court finds that the loss of prestige and opportunity for career advancement associated with the reassignment is sufficient, under these circumstances, to create a jury issue with respect to whether Harasin suffered an adverse employment action, it is not necessary for the Court to address the alleged adverse effects on Harasin's health. Neither party has adequately addressed the issue of whether these alleged adverse effects may be considered in evaluating the "adverse employment action" element of Harasin's prima facie case, and the Court expresses no opinion on this issue here.

of a causal connection."  Id. (citations omitted).  Regardless of the temporal proximity, however, there cannot be a causal connection where the decisionmaker was not aware of the protected activity at the time of the alleged adverse employment decision.  Id. ("[T]emporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct.") (citations omitted).

Defendants argue Harasin cannot demonstrate a causal connection between her protected activity and her reassignment to the morning news shift because Rigby was not aware of Harasin's fibromyalgia when she decided to reassign Harasin.  (Defs.' Br. in Supp. of Mot. for Summ. J. at 12-14.)  Citing Rigby's deposition testimony, Defendants state that "Rigby decided in April 2002 to move [Harasin] to the morning shift, and she did not learn that [Harasin] suffered from fibromyalgia . . . until a meeting on May 2, 2002."  (Id. at 13) (citing Rigby Dep. at 15-16, 58, 132).  Rigby's testimony, however, does not support Defendants' claim. Rigby testified that the decision to reassign Harasin to the morning news shift was made during the course of several meetings with WSB-TV management personnel in April and May 2002, but that she was unsure in which month the decision was

made and whether it was made before or after the May 2, 2002 meeting in which

she learned of Harasin's fibromyalgia.  (Rigby Dep. at 134-35.)  Her testimony is as

follows:

> Q:      . . . [I]f your testimony is that you made the decision in April, why
> didn't you say anything to her on May 2 about [the reassignment]?
>
> A:      I don't know that we had made all the moves, that we had made all the
> determinations.  That wasn't the point of that particular meeting at that
> time.  I don't know where we were in the decision process . . . .
>
> Q:      Well, how do you know for sure that you had decided in April and not
> sometime in May to transfer [Harasin] to the 3:00 a.m. shift?
>
> A:      I believe I said I don't know for sure what day it was.  It was
> sometime in April or early May.  I don't know.
>
> Q:      . . . So it could have been after May 2?
>
> A:      It could have been.  I don't know.

(Rigby Dep. at 134-35.)  Clearly, Rigby's testimony concerning the date on which

she made the decision to reassign Harasin is equivocal.  Viewing the facts in the

light most favorable to Harasin, as the Court is required to do at the summary

judgment stage, it is possible that Rigby's decision to reassign Harasin was made

shortly after the May 2, 2002 meeting at which she learned that Harasin's

intermittent leave was related to her fibromyalgia.  Such close proximity is strong

evidence of a causal connection between Harasin's protected activity and her reassignment to the morning news shift.  Accordingly, Harasin has established a prima facie case of retaliation with respect to her reassignment, and the burden now shifts to Defendants to articulate a legitimate, nonretaliatory reason for Rigby's decision to reassign her.

2.   *Legitimate, Nonretaliatory Reason*

The employer's burden in articulating a legitimate, nonretaliatory reason "is merely one of production; [the employer] need not persuade the court that it was actually motivated by the proffered reasons."  Wascura v. City of S. Miami, 257 F.3d 1238, 1243 (11th Cir. 2001) (quotations omitted).  In this case, Defendants assert Rigby decided to reassign Harasin to the morning news shift as part of her ongoing assessments of her WSB-TV staff's abilities and her efforts "to place the right people with the right newcast."  (Defs.' Br. in Supp. of Mot. for Summ. J. at 15-18.)  Specifically, Rigby testified that she concluded that Harasin's "abilities were best served on the morning newscast" because she believes Harasin is a good "live reporter" but is not as good at developing her own story ideas.  (Rigby Dep. at 89-90.)  This justification constitutes a legitimate, nonretaliatory reason for Rigby's decision.

-18-

3.    *Pretext*

Because Defendants have articulated a legitimate, nonretaliatory reason for

Rigby's decision, Harasin, to avoid summary judgment, must present sufficient

evidence from which a reasonable jury could conclude Defendants' stated reason

was a pretext for unlawful retaliation.  See Smith, 273 F.3d at 1314.  "[The Eleventh

Circuit's] pretext analysis focuses on a narrow question: Would the proffered

evidence allow a reasonable factfinder to conclude that the articulated reason for

the decision was not the real reason?"  Walker v. Prudential Prop. & Cas. Ins. Co.,

286 F.3d 1270, 1276 (11th Cir. 2002); see also Combs v. Plantation Patterns, 106

F.3d at 1538 (11th Cir. 1997) ("The district court must evaluate whether the

plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for

its action that a reasonable factfinder could find them unworthy of credence.")

(citations omitted).

Having reviewed the evidence of record in this case, and the arguments of

the parties, the Court finds Harasin has submitted sufficient evidence from which a

reasonable juror could find Defendants' legitimate, nonretaliatory reason for her

reassignment was pretextual.  First, viewing the facts in the light most favorable to

-19-

Harasin, Rigby's decision to reassign Harasin to the morning news shift was communicated to Harasin immediately after the May 2, 2002 meeting at which Rigby claims she first learned that Harasin's intermittent leave was related to her fibromyalgia.  The close temporal proximity between the meeting and Harasin's reassignment is strong evidence of pretext, especially considering Harasin's testimony that Rigby became aggravated and was skeptical regarding the nature of her condition and her need for intermittent medical leave.[8]  See generally Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1291 (11th Cir. 1998) ("[T]he showing of pretext need not necessarily involve further evidence; the evidence in a prima facie case might be strong enough to also show pretext.").  In addition, Defendants have offered shifting explanations for Harasin's reassignment.  See Combs, 106 F.3d at 1538; Bechtel Constr. Co. v. Sec'y of Labor, 50 F.3d 926, 935 (11th Cir. 1995) ("The pretextual nature of [the employer's] terminating [the plaintiff] is further demonstrated by [the employer's] shifting explanations for its actions.").  While Defendants in this litigation have staked out the position that Rigby's decision to

---

[8]  That there is testimony from Harasin that Rigby discounted that Harasin suffered from fibromyalgia raises questions regarding Rigby's real motivation for the reassignment which may be relevant to the issue of pretext.

reassign Harasin was motivated solely by her assessment of Harasin's abilities and the "fit" between those abilities and the morning news shift, Defendants in their response to Harasin's EEOC charge offered a different and inconsistent explanation: "Harasin was told quite clearly that a major reason for changing her shift was her constant and aggressive complaining about her work load on her previous shift. . . . .  Harasin has provided not a single allegation to rebut [WSB-TV's] reasons for changing her shift -- her constant complaints."  (WSB-TV's November 7, 2003 Letter to EEOC, attached to Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. as Ex. 14, at 4-5.)  This evidence is sufficient for a reasonable juror to conclude that Defendants' legitimate, nonretaliatory reason for Harasin's reassignment was pretextual.  Accordingly, summary judgment on Plaintiff's FMLA retaliation claim is DENIED.

       C.     <u>Harasin's Intentional Infliction of Emotional Distress Claim</u>

To succeed on a claim for intentional infliction of emotional distress, Harasin must allege facts establishing each of the following four elements: (1) intentional or reckless conduct; (2) which is extreme and outrageous; (3) a causal connection between the wrongful conduct and the emotional distress; and (4) severe emotional distress.  <u>Bridges v. Winn-Dixie Atlanta, Inc.</u>, 335 S.E.2d

445, 447-48 (Ga. Ct. App. 1985).  Defendants argue Harasin's claim for intentional infliction of emotional distress fails because her allegations regarding Defendants' conduct, even if true, do not rise to the level of "extreme and outrageous" behavior required to succeed on such a claim.

Georgia courts which have evaluated allegations of intentional infliction of emotional distress have stressed that the burden on a plaintiff bringing such a claim is "stringent."  Bridges, 335 S.E.2d at 447; accord Shepherd v. ISS Int'l Serv. Sys., Inc., 873 F. Supp. 1550, 1557 (N.D. Ga. 1994).  The extreme and outrageous element of the claim is met only if "the case is one which the recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"  See, e.g., ComSouth Teleservices, Inc. v. Liggett, 531 S.E.2d 190, 191 (Ga. Ct. App. 2000) (quoting Restatement (Second) of Torts, § 46(1)); United Parcel Serv. v. Moore, 519 S.E.2d 15, 17 (Ga. Ct. App. 1999) (same); Biven Software, Inc. v. Newman, 473 S.E.2d  527, 529 (Ga. Ct. App. 1996) (same).  A plaintiff's burden regarding this requirement of extreme and outrageous conduct is significant:

> [I]t has not been enough that the defendant has acted with
> an intent which is tortious or even criminal, or that he has
> intended to inflict emotional distress, or even that his
> conduct has been characterized by malice, or a degree of
> aggravation that would entitle the plaintiff to punitive
> damages for another tort.  Liability has been found *only*
> *where the conduct has been so outrageous in character,*
> *and so extreme in degree, as to go beyond all possible*
> *bounds of decency, and to be regarded as atrocious, and*
> *utterly intolerable in a civilized community.*

Northside Hosp., Inc. v. Ruotanen, 541 S.E.2d 66, 69 (Ga. Ct. App. 2000)

(emphasis added).  The question of "[w]hether a claim rises to the requisite level

of outrageousness and egregiousness to sustain a claim for intentional infliction

of emotional distress is a question of law" for the Court.  Cooler v. Baker, 420

S.E.2d 649, 650 (Ga. Ct. App. 1992).

Here, Harasin argues that Defendants' reassigning her to the morning news

shift in retaliation for taking FMLA leave, coupled with Rigby's written

disciplinary measures in the months following her reassignment, rises to the

requisite level of outrageousness and egregiousness to support her claim for

intentional infliction of emotional distress.  (Pls.' Resp. in Opp'n to Defs.' Mot.

for Summ. J. at 20-23.)  Courts have held that adverse employment decisions,

even if found to be discriminatory or retaliatory under federal law, typically are

not sufficiently egregious or outrageous to sustain a claim for intentional infliction of emotional distress.  See, e.g., Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1229 (11th Cir. 1993) (stating that "Georgia courts have held that an employer's termination of an employee -- however stressful to the employee -- generally is not extreme and outrageous conduct" and granting summary judgment on plaintiff's intentional infliction of emotional distress claim despite evidence his discharge was on account of his age in violation of the ADEA); Ward v. Papa's Pizza To Go, Inc., 907 F. Supp. 1535, (S.D. Ga. 1995) (holding that employer's denial of plaintiff's employment application on the basis of her disability was not sufficiently egregious conduct to support a claim for intentional infliction of emotional distress); Farrell v. Time Serv., Inc., 178 F. Supp. 2d 1295, 1299 (N.D. Ga. 2001) (granting defendant's Rule 12(b)(6) motion to dismiss plaintiff's intentional infliction of emotional distress claim where plaintiff alleged she was discharged on account of her pregnancy).  See generally Price v. State Farm Mut. Auto. Ins. Co., 878 F. Supp. 1567, 1570 n.3 (S.D. Ga. 1995) (observing that "[e]motional distress claims have also become a ubiquitous appendage to discrimination suits").  Having reviewed Harasin's allegations in this case, the Court finds the alleged adverse employment actions

taken against her, even if motivated by retaliatory animus as she claims, do not

even begin to approach conduct which could be "regarded as atrocious, and

utterly intolerable in a civilized community."  Accordingly, Defendants' motion

for summary judgment on this claim is GRANTED.

       D.     Johnson's Loss of Consortium Claim

      Johnson asserts a claim against Defendants for loss of consortium, alleging

that Harasin's reassignment to the morning news shift has caused a deterioration in

her health and that this deterioration has interfered with his right to her society,

companionship and conjugal affection.  (Pls.' Resp. in Opp'n to Defs.' Mot. for

Summ. J. at 22-24) (citing Johnson Dep. at 127).  This claim is wholly dependent

on the viability of Harasin's intentional infliction of emotional distress claim: "Loss

of consortium is a derivative tort, and no liability can attached where the defendant

owes no tort liability to the spouse."  Durley v. APAC, Inc., 236 F.3d 651, 658

(11th Cir. 2000) (granting summary judgment on the plaintiff's spouse's loss of

consortium claim because the plaintiff's claim for intentional infliction of emotional

distress claim had been dismissed).  Because Harasin's intentional infliction of

emotional distress claim has been dismissed, Johnson's loss of consortium claim fails as a matter of law and summary judgment on this claim is GRANTED.[9]

## III.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [54] is **GRANTED IN PART** and **DENIED IN PART**.  Defendants' motion is **GRANTED** with respect to Harasin's claims for intentional infliction of emotional distress, negligent infliction of emotional distress and negligent retention, her FMLA retaliation claims based on alleged adverse employment actions other than her reassignment to the morning news shift, and Johnson's loss of consortium claim.  Defendants' motion is **DENIED** with respect to Harasin's FMLA retaliation claim based on her reassignment to the morning news shift.

**IT IS FURTHER ORDERED** that the parties shall file their proposed, consolidated pretrial order on or before December 5, 2005.  The Court will schedule a pretrial conference immediately thereafter and, in accordance with Local

---

[9]  Harasin's FMLA retaliation claim does not provide a basis for derivative liability for Johnson's loss of consortium claim.  See Durley, 236 F.3d at 658 (holding that the plaintiff's Title VII failure to promote claim did not provide a basis for derivative liability for the spouse's loss of consortium claim).

Rule 16.4A, the case shall be presumed ready for trial on the first calendar after the

pretrial order is filed.


**SO ORDERED**, this 4th day of November, 2005.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE